# AFFIDAVIT

STATE OF WEST VIRGINIA

COUNTIES OF PUTNAM AND KANAWHA, to-wit:

I, Sean McNees, being first duly sworn, do hereby depose and state as follows:

1. I am currently employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since January of 2016. I am assigned to ATF's Charleston, West Virginia, Field Office.

2. I have investigated cases involving firearms-related offenses, arson, crimes of violence, crimes involving individuals conspiring to obtain or use firearms to commit felony offenses, the illegal sale, possession, and use of firearms during the commission of these criminal acts, as well as the use, distribution, and possession of illegal controlled substances. I have investigated crimes involving the illegal possession of firearms, and the trafficking of assorted controlled substances. I have utilized cooperating individuals to make controlled purchases of firearms and drugs. I have experience and specific training related to the identification of firearms and ammunition, and the function of firearms and destructive devices. I have training and experience that has made me familiar with the appearance, packaging, paraphernalia and distribution of

controlled substances such as, cocaine powder (HCl), cocaine base (crack), heroin, marijuana, LSD, opioid and other pharmaceuticals, methamphetamine and other commonly used street drugs. I am also familiar with tactics utilized by firearms traffickers, and illegal possessors of firearms to distribute, acquire, maintain and possess illegal firearms.

3. I graduated from a ten (10) week criminal investigator training course at the Federal Law Enforcement Training Center, where the course of study dealt with basic criminal investigation techniques. In addition, I graduated from the twelve week (12) Bureau of Alcohol, Tobacco and Firearms (ATF) National Academy, where a portion of the course of study dealt with violations of federal firearms laws, federal explosives laws, bomb scene investigation and arson investigation.

**PROBABLE CAUSE**

4. In September of 2019, Special Agents (SAs) from the ATF Charleston Field Office received information from ATF Industry Operations Investigator (IOI) Melinda Adamson (Adamson) in reference to Stephen SIMMONS (hereinafter SIMMONS).

5. Part of IOI Adamson's regularly assigned duties as an ATF IOI are to conduct compliance inspections with

individuals who have obtained a license from ATF to be engaged in the business of buying and selling firearms. Individuals who have obtained such a license from ATF are known as Federal Firearm Licensees (FFL).

6.    In September of 2019, IOI Adamson conducted an inspection of FFL James M. Pierce (FFL # 4-55-35940). Pierce had died on April 22, 2019. His son, Matthew Lawrence Pierce, had moved all firearm inventory to his personal residence. As part of his FFL, James Pierce had obtained an additional license from ATF to be engaged in the business of buying, selling, and manufacturing firearms that are regulated and defined under the Nation Firearms Act (NFA), which would include firearms such as machineguns and silencers.

7.    As defined in 26 U.S.C. § 5845(b), a "machinegun" is, "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of a trigger."  The term also includes the "frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be

assembled if such parts are in the possession or under control of a person."

8.      As defined in section 18 U.S.C. § 921, the terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

9.      It is unlawful for any person to possess firearms such as machineguns and silencers or any other NFA firearms unless that person has paid the required appropriate Special Occupation Tax and had the firearms registered in the National Firearm Registration and Transfer Record (NFRTR).

10.     During the course of IOI Adamson's inspection, she learned that Matthew Pierce had sold several firearms to SIMMONS. One of the firearms sold to SIMMONS was a Glock, model 17, 9mm caliber pistol, which had an auto sear and a select trigger pack that allowed the firearm to function as a machinegun.

11.     Matthew Pierce stated that the reason he sold the Glock pistol to SIMMONS was because SIMMONS had told him he had an

NFA Class 3 License. However, IOI Adamson searched the ATF Federal Licensing System database and could not locate SIMMONS, which meant SIMMONS was not licensed by ATF to be engaged in the business of buying and selling firearms, including NFA firearms. In addition, the NFA ATF License presented by SIMMONS was entirely fraudulent as ATF had never issued such licenses as the one SIMMONS had presented. Matthew Pierce stated that he thought SIMMONS had a legitimate ATF License and therefore no ATF paperwork was completed, nor a background check conducted for any of the firearms SIMMONS purchased.

12. On or about October 09, 2019, ATF SA Jason Berty and SA Sean McNees met with SIMMONS' wife, Whitney Simmons, who was the only person home at the SIMMONS' residence, 1929 7th Ave., Saint Albans, WV 25177. SA McNees identified himself and SA Berty as law enforcement officers, to which Mrs. Simmons invited SA Berty and SA McNees into her home where she agreed to speak further about her husband, SIMMONS.

13. As SAs were speaking to Mrs. Simmons, an odor of marijuana was present in the residence. Immediately adjacent to the living room area where SAs were standing and speaking with Mrs. Simmons was the kitchen. SA McNees observed a digital scale and marijuana residue on the kitchen counter. Mrs. Simmons was questioned as to the origin of the marijuana,

at which time she voluntarily stated it was her husband's, SIMMONS, and that she does not allow it or want it in her home, but that SIMMONS regularly smoked marijuana.

14. Mrs. Simmons then gave verbal consent for SA McNees to look around the residence and garage, stating that SIMMONS had several guns in the residence, and she knew he kept his marijuana in the garage. When asked how often or what quantity of marijuana SIMMONS used, Mrs. Simmons stated that she did not know and that SAs would have to ask SIMMONS, but that he smoked it regularly. Mrs. Simmons stated that SIMMONS was a full-time student in grad school and a student intern with the Red Cross, in Cross Lanes, WV, at which time she agreed to call SIMMONS and ask him to come home. While waiting for SIMMONS to arrive at his home, Mrs. Simmons continued to speak to SA Berty and SA McNees, repeating that SIMMONS smoked marijuana but she would not elaborate as to the quantity or frequency of his usage.

15. SIMMONS arrived at his residence and upon his arrival, SIMMONS parked his vehicle in the rear detached garage, and was met in the back yard by SA Berty and SA McNees. SA McNees verbally advised SIMMONS that he was not under arrest and that he was voluntarily speaking to SAs, to which SIMMONS acknowledged that he understood. SIMMONS stated that he was expecting ATF to come and talk to him, with regards to Matthew

Pierce, after he, SIMMONS, had previously called and spoke to the ATF supervisor Adam Black concerning the allegations from Matthew Pierce.

16. As SAs were speaking to SIMMONS, the rear garage door was ajar, and a strong odor of marijuana could be smelled. SA Berty asked SIMMONS if there was any marijuana in the garage, to which SIMMONS stated he had smoked a quantity of marijuana in his car. At that time, SIMMONS gave SA Berty verbal consent to retrieve the remnants of a marijuana blunt from an ashtray in the center console of SIMMONS' vehicle, located inside the rear, detached garage. SIMMONS then told SAs if they wanted to search any further, that they would need to obtain a search warrant, but that he was still willing to speak about the allegations from Matthew Pierce.

17. The interview was then continued on the front porch of the residence. SIMMONS advised that around August of 2019, he had purchased several firearms from Matthew Pierce including some firearms which were machineguns. SIMMONS later returned the machineguns to Matthew Pierce after learning that ATF was looking into his Pierce's father's former FFL.

18. SIMMONS stated that he loved firearms, had been drawn to them for years and went to local gun shows where he bought firearms, parts, and associated paraphernalia. SIMMONS stated that he had bought several unfinished receivers and then

completed the firearms for his own use. When asked how many firearms he possessed, SIMMONS stated that there were two or three handguns and two or three rifles in his home at that point.

19. SAs then questioned SIMMONS about his marijuana use and any that was present in the residence. SIMMONS stated that he did not sell marijuana, just used it personally. SIMMONS went on to explain that he used to be addicted to prescription pills and that about five years ago he quit them but started self-medicating his former addiction by smoking marijuana. SIMMONS stated that for the past two or three years he had been smoking marijuana every other day or so as a means of controlling his former opiate addiction.

20. On or about May 14, 2022, Officers with the Saint Albans Police Department (SAPD) responded to 1929 7th Avenue, Saint Albans, WV 25177, in reference to a male subject allegedly beating a pregnant woman at that location. Upon arrival, SAPD Officers learned from the complainant, Whitney Simmons, that her husband, SIMMONS, had been fighting with her and that he was inside the residence. Officers then attempted to locate SIMMONS and upon entering the residence, immediately recognized a strong odor of marijuana emanating throughout. As Officers searched for SIMMONS, they gave loud verbal commands, to which they received no response. Officers

continued to look for SIMMONS and while doing so, they located: a quantity of suspected marijuana (in plain view), a set of digital scales, numerous firearms, and large quantities of ammunition (spread throughout the residence), before eventually locating SIMMONS in an upstairs bedroom of said residence.

21.    Mrs. Simmons then provided a statement to Officers that she routinely suffered from domestic violence from SIMMONS and that she wanted to get away from her husband.  She advised that he was a habitual user of marijuana daily, and she believed he was also using methamphetamine.  Based upon a totality of the circumstances, SIMMONS was arrested, and a subsequent state search warrant was obtained and executed on the residence.  Fourteen firearms, a quantity of methamphetamine, a quantity of marijuana, approximately 8,956 rounds of assorted ammunition (based upon weight), and (1) Apple iPhone belonging to SIMMONS were recovered during the search.

22.    On or about May 24, 2022, the SAPD turned over the firearms, ammunition, and SIMMONS' cellphone to SAs with the Charleston ATF Charleston Field Office. A federal search warrant was then obtained and executed on SIMMONS' cellphone. During the search of the cellphone the following relevant items were located.

**Videos**

a. Video created on or about October 10, 2020, that showed SIMMONS firing what appeared to be a Glock pistol with a drum magazine. The pistols rate of fire was consistent with it functioning as a machinegun.

b. Video created on or about November 12, 2020, that depicted what appeared to be a firearm silencer.

c. Video created on or about December 4, 2021, that showed SIMMONS firing an AK-47 type rifle. The rifles rate of fire was consistent with it functioning as a machinegun.

d. Video created on or about October 2, 2021, that showed an unknown individual firing what appeared to be a Glock pistol. The pistols rate of fire was consistent with it functioning as a machinegun.

e. Video created on or about February 17, 2022, that depicted what appeared to be the receiver for an AK-47 style firearm.

**PHOTOS**

f. Numerous images of various firearms, firearm parts and firearm accessories.

g. Image created on or about January 11, 2022, that depicted an AK-47 style firearm (along with the date and time this photo was created, information on where the photo was taken was also obtained from the search of SIMMONS'

phone. Latitude and Longitude coordinates for this photo were listed as (38.351722, -81.741623). When checked, the coordinates showed the location as being across the street from Appalachian Mini Storage located at 5301 Indiana St., South Charleston, WV 25309. When looking at the background in the image it appeared to be consistent with being inside of a storage unit complex. From past training and experience your affiant knows that typically when location information is obtained from a cellphone extraction the listed location is an approximate location).

h. Image created on or about April 15, 2022, that depicted what appeared to be marijuana.

i. Image created on or about May 12, 2022, that depicted what appeared to be a firearm silencer.

**TEXT MESSAGE CONVERSATIONS**

j. SIMMONS communicated with a contact in his phone under the name of "Mikey" between the dates of April 20, 2022, and May 12, 2022. Based upon your affiants training and experience, the conversations between the two individuals showed that SIMMONS was obtaining marijuana from "Mikey."

k. On or about April 28, 2022, SIMMONS communicated with "Mikey."

Mikey: My boy was like. I'll front you a 100 of them if u want. Lol. I said he'll no I have nowhere to hide 100. He'll I have trouble hiding 10 lol.

SIMMONS: Bro…get a storage unit. What time would it be cool to come by?

l. On or about May 12, 2022, SIMMONS again communicated with "Mikey." SIMMONS sent a photograph of a pistol to "Mikey" at approximately 4:02 am., then the following conversation occurred.

SIMMONS: Got the handle wrapped so no prints

Mikey: Perfect

SIMMONS: She runs smoothly

Mikey: so you gave it a test run?

SIMMONS: Oh yeah full blast too

Not a hiccup

At approximately 4:04 am. their conversation continued.

Mikey: Cool. Suppressor?

SIMMONS: It's in the works I'd say 2 weeks max. I have to get that stuff sent somewhere else but it's in hand.

Mikey: Ok sounds good.

SIMMONS then responded with a photograph of what appeared to be a firearm silencer.

m. On or about May 12, 2022, SIMMONS communicated with a contact in his phone under the name of Whitney Simmons.

SIMMONS: I think she told them I came to class always smelling like weed too. But they smoke I can tell by how they acted. Said they didn't mind at all if I smoked just be professional with it

SIMMONS: Of course I denied it

Whitney Simmons: Kids will be different.

n. Between the dates of February 18, 2022, and May 7, 2022, SIMMONS communicated on numerous occasions with a contact in his phone under the name of "Joey Hastings." SIMMONS and Hastings appeared to be engaged in a relationship in which they would obtain narcotics together. On or about February 23, 2022, the following messages were exchanged.

Joey Hastings: Did u like that? God damn 25.5 hrs later I just starting feel normal lol.

SIMMONS: Yeah I just tried it actually

o. On or about April 3, 2022, "Joey Hastings" sent the below message to SIMMONS.

Joey Hastings: Are u in desperate need of subs? If so I can try some people I aint talked to in while or that may need ride to get

**INTERNET SEARCH HISTORY**

p. On or about April 28, 2022, SIMMONS searched the term "buy glock switch"

q. On or about May 7, 2022, SIMMONS searched the term "glock selector"

23. On August 3, 2017, the ATF Firearms & Ammunition Technology Division issued a memorandum alerting law enforcement of the existence of Glock conversion devices – commonly known as "Glock Switches" or "Glock Auto Sears." The conversion of a pistol using a Glock Auto Sear takes approximately 60 seconds. A converted Glock pistol has a fire-rate of approximately 1,100 to 1,200 rounds per minute. Such conversion devices fall within the definition of machinegun under 26 U.S.C. § 5845(b). It is unlawful for any person to possess such a device unless that person is properly licensed and has paid the appropriate Special Occupation Tax required of those manufacturing, importing, or dealing in machineguns or any other NFA firearms.

24. Based upon my training, experience, and conversations with other law enforcement officers I also know that Glock conversion devices, such as the ones SIMMONS searched for, are often manufactured outside of the United States, and are typically purchased over the internet. The devices are then sent through the mail to the purchaser. I have been

involved in the investigation of multiple individuals who have purchased such devices over the internet and had them sent directly to their residence or place of business. I also know that once the purchaser takes possession of the device, it is common to have to utilize various hand tools or machine tools in order to fit the device to a particular firearm.

25.     On or about December 13, 2022, SA Berty and SA McNees interviewed Whitney Simmons at her residence, 1929 7th Avenue, Saint Albans, WV 25177. Mrs. Simmons stated that she and SIMMONS were going through a divorce and SIMMONS no longer lived with her. He currently lived off of 32nd Street in Nitro, WV, in the apartment at the top of the stairs.

26.     Mrs. Simmons stated she knew where all of SIMMONS' "Shit" was. She elaborated upon that statement, to mean where all of SIMMONS' firearms were.  Mrs. Simmons stated that she knew SIMMONS was still building firearms, and that he has a lot of them in a storage unit near Rock Lake, WV.  She then stated that when her and SIMMONS were still together, he would take guns from their home and would stop at the storage unit and drop them off.  Mrs. Simmons stated she does not know which unit number is SIMMONS', but knows it is in the last building, all the way in the back. Mrs. Simmons then went on to further discuss the storage unit belonging to SIMMONS. She stated

that she believed SIMMONS put the unit in one of his friend's name, Jeremy Flowers, and did not know whether Flowers even knew about the storage unit.

27.   When asked additional questions about SIMMONS' firearms, she stated that she had seen SIMMONS making firearms in their home, and she had seen him with firearms all over the place at his current residence. Mrs. Simmons identified a picture of a possible silencer as something she had seen in SIMMONS' possession in the past. She went on to say that she did not know where SIMMONS got any of his firearms, other than what he bought online and shipped to their residence when they were together, but he no longer receives packages at her home, since their separation. Mrs. Simmons stated that when they were still together, SIMMONS used to talk about machineguns and other weapons on the phone with whomever all the time.

28.   Mrs. Simmons stated that she started divorce proceedings following an incident when she called the police back in May of 2022, after she found evidence of SIMMONS using methamphetamine in their home. Mrs. Simmons stated that SIMMONS still used marijuana and had done so since they got together back in 2012. When asked how often, Mrs. Simmons stated SIMMONS smoked every day. She then stated that as part of their divorce, that SIMMONS has been ordered to take drug screens to see their kids and that he had failed every

one of them. Mrs. Simmons advised multiple times during the interview that she did not like SIMMONS anymore and wanted to help SAs arrest him. Mrs. Simmons also identified SIMMONS phone number as 304-437-7737.

29.     Subpoenaed phone records for telephone number 304-437-7737 show that the subscriber is Stephen Simmons with a listed service and billing address of 3211 32nd Street, Nitro, WV 25143.

30.     On or about December 14, 2022, SAs Berty and Jonese interviewed Mark Perine, owner of Appalachian Mini Storage, located at the corner of Rock Lake Drive and Indiana Street, 5301 Indiana St., South Charleston, WV 25309.

31.     Mr. Perine stated that he did not know SIMMONS, nor did he have any units rented to SIMMONS.  When asked about Jeremy Flowers, Mr. Perine stated that Flowers did rent Unit #152, in the back, where you would gain access through Door F.  Mr. Perine went on to say that Flowers began renting Unit #152 back in August of 2021, and that he never formally met Flowers, but did talk to someone one day, around 10 months ago, who was in and out of that unit.

32.     Mr. Perine further explained that he did daily rounds at all his storage facilities, and that one day as he was doing his rounds at Appalachian Mini Storage, a white male was seen inside of Unit #152.  Mr. Perine stated as he was

walking the corridors around the facility, he could see several firearms in Unit #152, and that it caught his attention. Mr. Perine said that as he was passing Unit #152, an unknown white male stepped out and spoke to him about guns. Mr. Perine stated that the unknown white male showed him the lower part of a pistol and engaged him in conversation, stating that he was a gunsmith and made the firearm he was holding. Mr. Perine stated that he then left and didn't think anything further of the incident, until this date when ATF came to talk to him about what turned out to be Flowers' storage unit. Mr. Perine stated he did not know the individual, nor had he seen him since that incident. Mr. Perine then stated that he has security cameras around the facility, and that should there be any activity in Unit #152, he would alert SAs so that they could review the footage. Mr. Perine was shown a photograph of SIMMONS, he advised that SIMMONS was not the individual that he had seen at Unit #152.

33. On or about December 15, 2022, Mr. Perine contacted SA Berty regarding Unit #152. Mr. Perine stated that the prior evening around 6:48 pm, an individual was caught on his surveillance video, removing what appeared to be several firearm cases from Unit #152. Mr. Perine stated he

did not know the individual, only that he was a white male

wearing glasses, and that the individual took what appeared

to be firearm cases from Unit #152 and placed them in his

vehicle, locking Unit #152 as he left. Mr. Perine then

allowed SA Berty to download a copy of the surveillance

footage from December 14, 2022.

34.     When the surveillance video was later reviewed by SAs it

depicted SIMMONS taking several firearm cases from Unit #

152.

35.     On December 21, 2022, SA McNees conducted surveillance

on SIMMONS. He was observed on multiple occasions entering

and exiting the main entry door at 3211 32nd Street, Nitro WV

25143. At approximately 3:47 PM photographs of SIMMONS were

taken of him on the front porch of the apartment building.

SIMMONS was also observed to be entering and exiting a silver

in color Subaru Impreza (WV 3YS-140), which was parked on the

street in front of the apartment building. The vehicle was

registered to Whitney Simmons at 1929 7th Ave., Saint Albans,

WV 25177.

36.     On December 28, 2022, SA Berty was notified by Mr. Perine

of Appalachian Mini Storage that someone had been in Unit #

152. SA McNees then responded to Appalachian Mini Storage and began to review video footage.

37.    SA McNees then observed that on December 22, 2022, SIMMONS removed several more firearm cases from Unit # 152 and loaded them in a vehicle. The exterior video footage appeared to depict the above-mentioned Subaru Impreza, registered to Whitney Simmons, as the vehicle that SIMMONS came and went in.

38.    On December 29, 2022, SA McNees, and ATF Task Force Officer (TFO) Weaver interviewed Jeremy Flowers. During the interview Flowers advised that he had indeed rented a storage unit for SIMMONS but did not know what was in it. Flowers knew that SIMMONS was into firearms and had "a lot" of them.

39.    SIMMONS had loaned Flowers some money for a down payment on a vehicle and Flowers had then obtained a storage unit for SIMMONS in return for the loan. Flowers also agreed to make the monthly rental payments on the storage unit. Flowers had obtained the storage unit for SIMMONS approximately one year prior to the date of him being interviewed. Flowers advised that everything in the unit belonged to SIMMONS and believed that there were a "few guns" in the unit. Flowers had seen SIMMONS with a firearm that had a silencer on it approximately a year ago. When asked if Flowers had seen SIMMONS with any

machineguns before he advised that he believed that SIMMONS had a "couple automatics."

40. Flowers had also previously shot a "9mm pistol" that belonged to SIMMONS that was an "automatic."

41. Flowers was asked if he knew about SIMMONS drug use and advised that in approximately 2009 SIMMONS was using "heroin" and "Oxycontin." In approximately 2016 SIMMONS then told Flowers that he wasn't using drugs anymore, he did however drink often. Then after the last time that SIMMONS had been arrested, he had heard from Whitney Simmons that SIMMONS had been using drugs again.

42. Flowers then agreed to show SA McNees text messages that he had with SIMMONS. Flowers identified SIMMONS phone number as 304-437-7737. Flowers also showed SA McNees a digital payment receipt to "Appalachian Mini S" for $70.00 from December 9, 2022. Flowers identified the unit he had rented for SIMMONS as Unit # 152.

a. September 12, 2022:

<u>Flowers</u>: U Still staying in nitro

<u>SIMMONS</u>: Yeah

Have an apartment here on 32 street

b. September 12, 2022:

<u>SIMMONS</u>: Trying to fight for me but not having much luck. They want me to go to rehab for smoking weed

but no rehabs do that nor do I think I need rehab
for weed.

c. September 12, 2022,

Flowers: What about passing a drug test then?

SIMMONS: They gave me one and that was it, I figured
they would give me a chance to clean up but nope.

43.     Flowers then agreed on December 29, 2022 to conduct a
recorded phone call to SIMMONS at number 304-437-7737. During
the call, Flowers asked SIMMONS about the "storage unit" and
SIMMONS advised that he had started moving things out of it,
due to Whitney Simmons threating to bring up the "guns" that
SIMMONS had in the storage unit in court. SIMMONS then advised
that he currently had the firearms at his "apartment" until
he could figure out another location to store the firearms.

44.     SIMMONS identified his residence as Apartment A 3211 32nd
Street. SIMMONS further stated that when you went into the
front door of the apartment building and looked up the stairs
his apartment was at the top of the stairs. SIMMONS was asked
if he had any firearms that he was trying to sell, he advised
that he did. SIMMONS advised that he had "anything but hunting
rifles." Flowers then told SIMMONS he had a friend that was
interested in obtaining a silencer. SIMMONS responded, "yeah
I can make them and everything." He then added that it
depended on how Flower's friend wanted to "operate," which

could be the "legal" way or the "illegal" way. When asked if he currently had anything, SIMMONS advised "oh yeah," "I always have some."

45. When asked how much he would charge for a silencer, SIMMONS advised it depended on what caliber the firearm was and what type of material he made the silencer out of. SIMMONS then stated that he currently had "a little bit of everything." When asked specifically about a silencer for a 9mm, SIMMONS estimated a price of $300.00 to $400.00. Flowers then asked SIMMONS he could come see him the following week and obtain a silencer, SIMMONS responded with "sure."

46. Flowers then asked SIMMONS if he still had any "weed." SIMMONS replied that he did and added that he had some "good stuff."

47. On December 30, 2022, SA McNees conducted a records search of SIMMONS' name through the National Firearm Registration and Transfer Record. SIMMONS did not have any NFA firearms registered to him. Registration must be completed in order to receive, transfer, manufacture, and possess NFA firearms.

48. Based upon my training, experience and conversations with other law enforcement officers, I know that firearms, unlike various forms of controlled substances and contraband, are not consumed in use, and are typically

stored in residences, vehicles or places of safe haven for extended periods of time. Firearms also have an intrinsic monetary value, which is often accompanied by historic value. Firearms are usually secured by the possessor in safe places to prevent theft, loss or damage. I also know that it is common for individuals who unlawfully possess firearms or narcotics to store those items in storage units in order to conceal there whereabouts.

49.    Based upon my training, experience and conversations with other law enforcement officers, I know that individuals who have a past history of storing firearms and narcotics in their residences often continue to do so even after having contact with law enforcement.

50.    Based upon the information set forth herein, probable cause exists that Stephen SIMMONS has committed violations of:

   a. Title 26, U.S.C. §§ 5861(b) and 5861(d)- receiving/transferring/manufacturing and possessing unregistered NFA firearms.

   b. Title 21, U.S.C. § 841 (a)(1)- Possession with intent to distribute marijuana.

   c. Title 18, U.S.C § 922(g)(3)- Possession of a firearm by an individual who is an unlawful user of and

addicted to a controlled substance as defined in Title 21, U.S.C. § 802.

51. Further, probable cause exists that evidence of these offenses is currently located at Apartment A 3211 32nd Street, Nitro, WV 25143 ("SUBJECT PREMISES"), and appurtenances thereto.

Further your affiant sayeth naught.

SA Sean A. McNees

Sworn to before me, and subscribed Via telephone per FRCrP 4.1 ~~in my presence~~, this 3rd day of January 2023.

Omar J. Aboulhosn
United States Magistrate Judge